IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ANTONIO M. OSBORNE,

    Petitioner,                      No. CIV S-08-1490 JAM GGH P

   vs.

JAMES A. YATES,

    Respondent.                     FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 2006 petitioner was convicted of first degree robbery (Cal. Penal Code § 211), first degree burglary (Cal. Penal Code § 459) and attempted voluntary manslaughter (Cal. Penal Code §§ 664 and 192(a)). The jury also found true three allegations that petitioner was armed with a firearm in the commission of the charged offenses within the meaning of Cal. Penal Code § 12022(a)(1). Petitioner was sentenced to 9 years, 8 months.

        Petitioner alleges that his upper term sentence of six years for robbery violated Cunningham v. California, 549 U.S. 270, 127 S.Ct. 856 (2007).

        After carefully considering the record, the court recommends that the petition be denied.

/////

Anti Terrorism and Effective Death Penalty Act (AEDPA)

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective. Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997). The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

The California Court of Appeal was the last state court to issue a reasoned opinion addressing the claim raised in this action. See Respondent's Exhibits, p. 62 of 67 (reasoned opinion of California Court of Appeal); p. 67 of 67 (record of order by California Supreme Court denying habeas petition). Accordingly, this court considers whether the denial of this claim by the California Court of Appeal was an unreasonable application of clearly established Supreme Court authority. Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000) (when reviewing a state court's summary denial of a claim, the court "looks through" the summary disposition to the last reasoned decision).

Discussion

Petitioner alleges that the trial court violated his Sixth and Fourteenth Amendment rights to a jury trial and due process by imposing the upper term for robbery at sentencing based on aggravating facts that were not found by a jury beyond a reasonable doubt.

In sentencing petitioner to the upper term, the trial court stated,

> Regarding the term to be imposed, again, I do find that there are circumstances in aggravation that far outweigh any circumstances that may exist in mitigation. This crime did involve a threat of great bodily harm. The defendant did engage in violent conduct, not only in the physical struggle, but on the calling of his brother to shoot through the door, which occurred, and could well have resulted in further injury or death to the victim.
>
> This defendant was on probation when this crime was committed. His prior performance on probation has been unsatisfactory, and I don't feel that there's any way that Mr. Osborne's participation in this offense could be, or was, or should, be viewed as simply defensive in nature. I understand that was his testimony, but the jury didn't accept it, and I don't see that as a factor in mitigation.
>
> Accordingly, the defendant will be sentenced to the high term of six years in the Department of Corrections for the violation of Penal Code Section 211, first degree, as alleged in Count 1–excuse me, as alleged in Count 3.

Respondent's Exhibit A, pp. 15-16.

In Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000), the United States Supreme Court held as a matter of constitutional law that, other than the fact of a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 520 U.S. at 490, 120 S.Ct. 2348. In Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531 (2004), the Supreme Court held that the "statutory maximum for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely, 542 U.S. at 303, 124 S.Ct. 2531.

In People v. Black, 35 Cal.4th 1238 (2005) ("Black I"), the California Supreme Court held that California's statutory scheme providing for the imposition of an upper term sentence did not violate the constitutional principles set forth in Apprendi and Blakely. The

4

Black I court reasoned that the discretion afforded to a sentencing judge in choosing a lower, middle or upper term rendered the upper term under California law the "statutory maximum." Black I, 35 Cal.4th at 1257-61.

In Cunningham, supra, the United States Supreme Court held that a California judge's imposition of an upper term sentence based on facts found by the judge (other than the fact of a prior conviction) violated the constitutional principles set forth in Apprendi and Blakely. Cunningham expressly disapproved the holding and the reasoning of Black I, finding that the middle term in California's determinate sentencing law was the relevant statutory maximum for purposes of applying Blakely and Apprendi. Cunningham, 549 U.S. at 291-294, 127 S.Ct. 856.

In light of Cunningham, the Supreme Court vacated Black I and remanded the case to the California Supreme Court for further consideration. Black v. California, 549 U.S. 1190, 127 S.Ct. 1210 (2007). On remand, the California Supreme Court held that "so long as a defendant is eligible for the upper term by virtue of facts that have been established consistently with Sixth Amendment principles, the federal Constitution permits the trial court to rely upon any number of aggravating circumstances in exercising its discretion to select the appropriate term by balancing aggravating and mitigating circumstances, regardless of whether the facts underlying those circumstances have been found to be true by a jury." People v. Black, 41 Cal.4th 799, 813 (2007) (Black II). In other words, as long as one aggravating circumstance has been established in a constitutional manner, a defendant's upper term sentence withstands Sixth Amendment challenge.

Relying on Black II, the Ninth Circuit recently confirmed that, under California law, only one aggravating factor is necessary to authorize an upper term sentence. Butler v. Curry, 528 F.3d 624, 641-43 (9th Cir.), cert. denied, --- U.S. ----, 129 S.Ct. 767 (2008).

In the instant case, the trial court imposed the upper term based on factors other than a prior conviction: 1) the crime involved violence and a threat of great bodily harm; 2) petitioner was on probation when the crime was committed; 3) petitioner's prior performance on

probation was unsatisfactory.[1]  Therefore, <u>Apprendi</u>, etc. error occurred because a jury did not make these findings.[2]  However, the <u>Apprendi</u>, etc. error was harmless.  <u>See</u> <u>Washington v. Recuenco</u>, 548 U.S. 212, 221-22, 126 S.Ct. 2546 (2006) (holding <u>Blakely</u> errors are not structural and are subject to harmless error analysis). To grant relief, this court must have "grave doubt" as to whether a jury would have found any of the relevant aggravating factors beyond a reasonable doubt.  <u>Butler</u>, 528 F.3d at 648.

Here, petitioner does not dispute that he was on probation at the time of the offense and that his performance on probation was unsatisfactory.  The trial court relied on the presentence report in making this finding.  <u>See</u> Respondent's Exhibit B, pp. 9-10.  The presentence report states,

> The defendant absconded from supervision services in case VCR154129, Felony 11359 H/S (three years probation granted 2001).  In the "Request for Warrant" report submitted to the Court 4/03, it was noted that the defendant had failed to drug test as directed, he had failed to attend counseling and therapy as directed, and he had not maintained contact with Probation and he had not paid on his fines/fees.  When he was re-arrested on the warrant six months later, he was found with a key to a vehicle which contained his property and a semi-automatic handgun.  He ran handcuffed from the scene.  He pled to 148 PC in case VCR 169638 and probation was reinstated in case VCR154129.
>
> Probation was again revoked in Case VCR 154129 in January 2004 when the defendant submitted two positive drug tests for cocaine (treatment was escalated to 3 AA/NA per week), failed to start his 190 day sentence for his previous violation and failed to appear for court 1-9-04.  On 10-2-06, the defendant admitted a probation violation in cases VCR 169638 and VCR177863 based on the guilty verdict in the Instant Offense.

<u>Id.</u>

---

[1] Cal. Rules of Court 4. 421 sets forth circumstances in aggravation which a court may rely on in imposing an upper term.  Rule 4.421(a)(1) provides that a crime involving the threat of great bodily harm or great violence constitutes an aggravating circumstance.  Rules 4.421(b)(4) and (5) state that circumstances in aggravation include if the defendant was on probation when the crime was committed and if the defendant's prior performance on probation was unsatisfactory.

[2] In the answer, respondent suggests that the trial court imposed the upper term based on a finding that petitioner's prior offenses were of increasing seriousness.  The trial court considered this factor in deciding not to sentence petitioner to probation.  Respondent's Exhibit A, p. 15.  However, the court did not specifically identify this as a factor in the decision to impose the upper term.

Based on the undisputed information in the presentence report, this court does not have any doubt that a jury would have found that petitioner was on probation at the time he committed the robbery and that his previous performance on probation was unsatisfactory.

The trial court also imposed the upper term because the robbery involved violence and the threat of great bodily harm. The presentence report contains a summary of the offense which petitioner does not dispute. Accordingly, it is adopted for these findings and recommendations:

> The following is a summary of a Vallejo Police report #05-4764 dated 3/09/05. Police were dispatched to an emergency call regarding shots being fired. Upon arrival police observed that victim L.M. was being treated for a gunshot wound to his back. Police noticed that L.M.'s wound appeared to be a through and through gunshot wound between the muscle and skin, on each side of victim's spine near the middle of his back. Additionally, L.M. had lacerations on his upper right lip, left portion of the lip, the right nostril and the lower part of his left nostril. L.M. reported that he had been robbed, and he was transported by air ambulance to John Muir Medical Center.
>
> While in the victim's two story apartment, police observed what appeared to be two bullet holes in a bedroom door. On the carpet outside the entrance of the bedroom, police located an expended shotgun shell. On the wall inside the bedroom, police noticed blood splatters and smears, as well as shotgun pellets embedded in the bedroom wall. Also, it appeared to police that a suspect exited the rear of the apartment by jumping from the balcony. Police went down stairs to the soft dirt, and observed a shoe print, which was later determined to match the soles of co-defendant Diandre Robinson's tennis shoes.
>
> A witness reported that she was in the parking lot when she heard a woman yell "Oh my God" and a man's voice shouting. She reported that as she walked towards the disturbance, she saw two witnesses standing on balconies flanking the victim's apartment. She asked if everything was ok, and one of the men told her he thought he heard shots coming from the victim's apartment. She then told a witness to call "911."
>
> In speaking with police, victim C.M. reported that when she pulled into the parking lot of her apartment complex, she noticed the front door of her apartment was open. As she exited her vehicle, a suspect wearing all black was running from the immediate area and climbing a fence adjacent to the parking lot. She then asked a neighbor where the individual (co-defendant Robinson) had come from, and the neighbor informed her that he believed that he had come from her apartment. C.M. reported that she left her child with another person and entered her apartment.
>
> As she entered the apartment, she saw victim L.M. and the defendant struggling in the front room. She then grabbed the defendant in a headlock and struggled with

him. She stated that the defendant pulled her towards the open front door and out onto the second story walkway which overlooks the parking lot. She stated that he was striking her in the head with his hands and arms, and was shouting at her the entire time to let go. C.M. stated that as she was struggling with him, he threw her to the ground, and her husband (L.M.) then came out on to the walkway. She reported that at this time, a struggle with L.M. and defendant ensued. A short time later, L.M. called the police. C.M. reported that she did not know whether the defendant ran away or was thrown from the second story balcony. She reported that when she grabbed him she noticed that he was very fatigued. She believed that his fatigue allowed her to struggle with him as long as she did, before he threw her to the ground.

Police contacted L.M. at the hospital. He stated that he was asleep when he received a phone call from the mother of one of his children. Victim L.M. stated that at this time, he realized that his wife and son were not at home. He reported that he heard a knock at the front door and thought he heard a child's voice. He then walked to the front door in his underwear and opened the door. He stated that he opened the door and walked away assuming it was his wife and son. He related that the next thing he knew, he was hit in the head with an unknown object. He advised that both the defendant and Robinson had guns, and were wearing black clothing (black "Hoodie" type jackets, black ski masks and black jeans). He reported that he turned and confronted the defendant, and a physical altercation ensued. The altercation moved to the area of the bedroom doorway, and L.M. stated that the co-defendant, who was not involved in the altercation, began to scream "Give me the money," "Where is the money?" He reported the next thing he heard was a gunshot and felt a burning sensation in his back.

L.M. reported that while struggling with him, the defendant tried to pull out what appeared to be a revolver. He stated while he and the defendant were fighting over the revolver, he was able to shut the bedroom door separating the defendant from Robinson. The victim reported that while continuing to wrestle with him, the defendant yelled out to Robinson for help. L.M. related that the defendant told Robinson to shoot through the door, and that he, L.M., heard a large bang which he believed was a shotgun blast. The victim reported that he was not hit by the round, and the defendant yelled for Robinson to shoot again. He stated that he then heard another shotgun blast, and that prior to the shotgun blasts, Robinson was kicking and hitting the bedroom door.

Victim L.M. reported that as he and the defendant fought over the gun, he was trying to point the gun at the defendant, and the defendant was trying to point the gun at him. L.M. stated that he then heard Robinson exit the rear of his apartment. L.M. reported that during his struggle with the defendant, the gun's trigger was pulled three times. He stated he heard two clicks and a "Pop," however he did not know if that round struck the defendant or where it went. He then reported that the handgun came from the defendant's front pocket, and that it was one of three guns that were present during the robbery. He advised that Robinson had a chrome semi-automatic handgun, and that it was this gun he was shot in the back with. L.M. reported that during the altercation, he gained control of the handgun and let the defendant go in attempts to find a phone and call police. He stated that as the defendant tried to get up, he observed his wife, victim C.M., arrive home. L.M. reported that an altercation began between his

8

wife and the defendant, and that he went to defend his wife. During this altercation, he punched, hit, and threw the defendant over the front balcony. L.M. stated that when the defendant landed on the ground, he got up and fled. Medical staff reported to police that L.M. received several stitches to his upper lip and nose, and that he was treated for two through and through gunshot wounds to his back.

While en route to the scene, assisting police observed Robinson, wearing a large heavy black jacket and black pants, walking on a warm and sunny day. Believing that he was involved in the shooting, a high risk stop was enforced. Robinson was ordered onto the ground, and during a search, police felt a soft object stuffed inside the left sleeve of the defendant's coat, which was discovered to be a black knit wool type ski mask. Police noted that Robinson was very sweaty and breathing heavily, and he was placed in the rear of the patrol car. A short time later, he was removed from the vehicle for an in-field line-up. He then spontaneously stated, "Is this all about the weed in that guy's apartment, huh?"

Robinson was transported to the police station, and his jacket, "beanie" cap and shoes were confiscated for evidence. When asked if he knew why he was at the police station, he reported that he did. Initially, he reported that he went to the victim's home with the defendant to make a purchase. He stated they knocked on the door and entered the home. He stated that while inside, the victim was speaking on the phone and then everything went "bad." He reported that a struggle ensued between the victim and the defendant, and the victim was shot. Upon further questioning, he reported that he had in fact picked up the weapons and fired them. He reported that when the defendant was struggling with the victim inside the bedroom, the door closed separating him from the defendant. He stated that the defendant was screaming for help and that he attempted to kick the bedroom door open, but was unsuccessful. He picked up a gun and fired it into the door and then picked up a shotgun and fired it into the door in an attempt to get inside. He reported that he was scared and unsuccessful and fled the apartment.

Later in the interview, Robinson reported that he was going to tell the truth about what had occurred. He advised that while he was at home, the defendant called him about getting marijuana from the victim. The defendant then picked him up in a truck driven by the defendant's girlfriend. He stated that when he got into the truck, he saw some guns. He advised that since the defendant had robbed other individuals in the past, he assumed that he intended to rob someone. Robinson told police that he has had numerous contacts with L.M. in the past, and only intended to purchase marijuana from him. He stated that when they arrived at the victim's apartment complex, he and the defendant exited the vehicle leaving the girlfriend in the truck.

Both he and the defendant went to the victim's residence and knocked on the door. He stated that prior to the victim answering the door, he noted that the defendant was carrying a backpack. The victim answered the door and let them in, and he told the victim that he wanted to buy marijuana. When the victim retrieved a large bag of marijuana, the defendant saw the bag of marijuana and decided to rob the victim. The defendant then took a handgun out of the bag and struck the victim in the head. Robinson told the police that a struggle ensued and

that the defendant shot at the victim once. He stated the struggle moved from the front towards the bedrooms. He stated that just outside the bedroom door, the defendant dropped his black bag and the small gun he was holding. When he went towards the bedroom to help the defendant, he saw that the victim was holding a gun. He reported at this time, the victim closed himself and the defendant inside the bedroom. He then heard the defendant yelling for help, and he tried kicking the door open, but was unsuccessful. He picked up the small handgun on the floor and fired it once through the door to get it open. It was ineffective and the defendant was still yelling for help. So, he then picked up the shotgun and fired it twice through the door trying to get it open, but he was unsuccessful. He stated that he picked up the defendant's black bag putting both guns and the bag of marijuana in it, and being confused, went to the back of the house and jumped off the balcony. He then stated that he had injured his toe when he jumped off the balcony. He returned to the truck and put the black bag in the truck. He stated that he was confused and scared, and walked away from the truck.

During investigation, police attempted to locate the defendant by contacting family members. On March 30, 2005, police contacted the defendant's grandmother by phone. She advised that she had received a telephone call from the defendant on March 9, 2005 asking her if she had seen Robinson. She advised that he didn't say anything else, and she told police that she believed that he may have fled the state. According to Solano County Jail records, the defendant was arrested in Georgia on July 15, 2005.

<u>DEFENDANT'S STATEMENT/COMMENTS</u>: The defendant was interviewed on October 31, 2006. Regarding the instant offense, the defendant reported that he didn't know anything about the robbery beforehand and that he had just gone to the victim's apartment to buy some marijuana. He related that it was his brother's idea (Robinson). He advised that he didn't testify about what happened since he was afraid that his brother's deal wouldn't go through. Although he knows his brother put the blame on him, he advised that he doesn't have any hard feelings for him. He explained that no matter what happens they are my family.

Respondent's Exhibit B, pp. 3-8.

Based on the undisputed factual summary above, and considering the fact that a jury found petitioner guilty of burglary and attempted voluntary manslaughter, this court does not have any doubt that a jury would have found that petitioner's robbery involved violence and the threat of great bodily harm.

Accordingly, for the reasons discussed above, the court finds that any <u>Cunningham</u> error was harmless. Because the denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority, the petition should be denied.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 08/10/09

/s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE

os1490.157